United States Court of Appeals,

Eleventh Circuit.

No. 96-6735.

Cylinda H. LANCASTER, as the administratrix of the estate of Harold B. Lancaster, Plaintiff-Appellant,

v.

MONROE COUNTY, ALABAMA;  Sheriff Thomas Tate;  Monroe County Commission;  Robert Rankins;  Eddie Wells;  and Ann Jackson, Defendants-Appellees.

July 11, 1997.

Appeal from the United States District Court for the Southern District of Alabama.  (No. 95-0351-CB-C), Charles R. Butler, Jr., Judge.

Before BIRCH and CARNES, Circuit Judges, and PROPST[*], Senior District Judge.

CARNES, Circuit Judge:

Harold Michael Lancaster died from an injury he sustained while in custody at the county jail in Monroe County, Alabama.  Cylinda Lancaster, Lancaster's widow and the administratrix of his estate, claims that Monroe County, the Monroe County Commission, Sheriff Thomas Tate, and Jailers Robert Rankins, Eddie Wells, and Ann Jackson are liable under 42 U.S.C. § 1983 and state law for failing to provide Lancaster with adequate medical treatment or supervision while he was in custody.  The district court granted summary judgment to all defendants.  We reverse in part and affirm in part as to the individual defendants.  As to Monroe County and the Monroe County Commission, we sever that part of this appeal and withhold any decision in it pending a decision of the en banc court in *Turquitt v. Jefferson County,* 102 F.3d 465 (11th Cir.1996) (granting hearing en banc).

**I. BACKGROUND**

A. FACTS

Taken in the light most favorable to the plaintiff, the evidence before the district court at

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for Northern District of Alabama, sitting by designation.

summary judgment was as follows.[1]  At approximately 7:45 p.m. on Monday, March 6, 1995, Lancaster was arrested by Officer James McDonald of the Frisco City Police Department and charged with driving under the influence of alcohol (DUI).  According to Officer McDonald, Lancaster had glazed and bloodshot eyes and slurred speech, his movements were slow and unsteady, and he had difficulty standing up.  He failed the field sobriety tests.

Because Frisco City has no jail facilities, Officer McDonald took Lancaster to the Monroe County Jail in Monroeville, Alabama.  Lancaster could hardly stand up when they arrived at the jail, and McDonald needed assistance to get Lancaster into the jail.  Once inside the jail, Lancaster was administered two intoxilizer tests.  The first test showed his blood alcohol content to be .324, and the second registered a blood alcohol content of .323.[2]

Lancaster was admitted to the jail and placed in the holding cell, or the "drunk tank," as it is called.  The drunk tank is a single cell with three bunk beds.  Although there are a number of cells in the jail,[3] and the jailer on duty has discretion about where to place an inmate, the jailers at the Monroe County Jail normally place DUI detainees in the drunk tank.  When Lancaster was placed in the drunk tank by Jailer Rankins, three inmates who had already sobered up were occupying the bottom bunks.  Lancaster climbed onto a top bunk.

Shortly after Lancaster was admitted to the jail, Ms. Lancaster called the jail.  She first asked Officer Wilson Bullard, a dispatcher, if her husband had been arrested, and if she could pick him up.

----

[1]In reviewing the district court's grant of summary judgment to the defendants, we must view all the evidence in the light most favorable to the non-moving party, Ms. Lancaster. *See, e.g., Tinney v. Shores,* 77 F.3d 378, 380 (11th Cir.1996).  The "facts" we state in this opinion for present purposes may not be the actual facts established at the trial. *See Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995).

[2]At the time of Lancaster's arrest, it was illegal to drive in Alabama with a blood alcohol content equal to or greater than .10. *See* 1995 Ala. Act 95-784 (reducing legal limit from .10 to .08 effective August 9, 1995).  Thus, Lancaster's blood alcohol content of .323 was more than three times the legal limit.

[3]The Monroe County Jail has two floors.  On the first floor, there is the drunk tank, two-man cells used primarily for sentenced prisoners and others who are considered escape risks, a six-man cell known as the trustee cell, and cells for female detainees.  On the second floor, the jail has a twenty-man cell used for work release prisoners and those awaiting trial.  The second floor also contains one eight-man cell and two two-man cells.

She then told Bullard that her husband was sick, that he could go into delirium tremens (DTs), and that he would have seizures when the alcohol wore off.[4] Officer Bullard directed the call to Defendant Robert Rankins, a jailer on duty. Ms. Lancaster asked Rankins if she could come get Lancaster out of jail. Rankins told Ms. Lancaster that due to Lancaster's high alcohol level, she could not pick him up until the next night.[5]

Ms. Lancaster then warned Rankins that Lancaster was a chronic alcoholic who had been in the hospital recently with grand mal seizures. She told Rankins that Lancaster's last seizure had almost killed him, and if he went very long without alcohol, he would have another seizure. Ms.

---

[4]Chronic alcoholics may suffer from epileptic seizures and/or DTs during withdrawal. *See* 9 *Attorneys' Textbook of Medicine* ¶ 59A.22(2) (Roscoe N. Gray & Louise J. Gordy eds., 3d ed. 1997). An epileptic seizure is a convulsion, *see Stedman's Medical Dictionary* 1401 (25th ed. 1990), which is a "contortion of the body caused by violent, involuntary muscular contractions of the extremities, trunk, and head." *Random House Unabridged Dictionary* 445 (2d ed.1993). DTs is "a form of acute organic brain syndrome due to alcoholic withdrawal" which is marked by "sweating, tremor, atonic dyspepsia, restlessness, anxiety, precordial distress, mental confusion, and hallucinations." *Stedman's Medical Dictionary* 409. The manifestations of alcohol withdrawal in a chronic alcoholic, and the relationship between seizures and DTs, have been explained as follows:

> Six to eight hours after the last drink, the signs and symptoms of withdrawal appear. They are generally most severe during the first twenty-four hours, then gradually subside during the following 48 to 72 hours. Signs include shaking (tremor) of the arms and hands and sometimes of the tongue and torso. The individual's face is flushed; there is sweating, nystagmus, a small increase in the heart rate (tachycardia), overactive reflexes, nausea and vomiting.

> Symptoms include subjective feeling states of disorientation, apprehension, and anxiety, as well as insomnia, nightmares, and sometimes hallucinations.

> There are two variants of the alcohol withdrawal syndrome: alcoholic epilepsy and delirium tremens. In alcoholic epilepsy ("rum fits"), generalized seizures occur with no preceding aura and are often followed by a brief state of confusion. They occur between seven to 48 hours after the last drink. Delirium tremens is the most severe form of withdrawal. It is experienced by about five percent of alcoholics undergoing withdrawal and about 30 percent of those who have rum fits. It develops about three to five days after the last drink.

9 *Attorneys' Textbook of Medicine, supra,* ¶ 59A.22(2).

[5]A person arrested for DUI in Alabama may not be released "upon bond or otherwise" until his blood alcohol content drops below the legal limit. *See* Ala.Code § 32-5A-191(1) (Michie Supp.1996). The Monroe County Jail has a chart on the wall that the jailers use to determine how long a DUI detainee must remain in jail.

Lancaster told Rankins that when Lancaster suffered a seizure, he would jerk, turn blue, and require oxygen. She gave Rankins the phone number of Lancaster's physician in case of an emergency. Rankins promised to watch Lancaster. Ms. Lancaster then spoke with her husband briefly. She told him to ask for a soft drink if he started to feel bad.

After Ms. Lancaster spoke with Rankins, Lancaster's father called the home of the Monroe County Sheriff, Thomas Tate, to ask if Lancaster could be released from jail that night. Lancaster's father told Tate the same information that Ms. Lancaster told Rankins; thus, Sheriff Tate was aware that Lancaster would have a seizure in eight to ten hours if he did not get alcohol or medicine, and that his last seizure had almost killed him. Lancaster's father also told Tate that Lancaster had experienced seizures a few months or weeks before.

Tate refused to release Lancaster from jail, but he assured the father that he would call the jail and tell them to check on Lancaster every fifteen minutes, which was, according to Tate, "the standard." Lancaster's father asked Tate if the jail had a procedure for treating his son if he experienced a seizure in jail. Tate advised him that if Lancaster experienced a seizure an ambulance would be called, and he would be taken to the hospital. After speaking with Lancaster's father, Sheriff Tate called the jail. He told Officer Bullard that Lancaster's father had called him and informed him that Lancaster had previously experienced seizures. Tate told Bullard that the jailers should check on Lancaster closely all night.

After speaking with Sheriff Tate, Lancaster's family went to see Officer Percy Nero at his home. Nero called the jail at approximately 9:30 p.m. and spoke with Jailer Geraldine Owens. Nero informed Owens that Lancaster's family was with him, and they had explained to him that Lancaster was very sick. Nero told Owens that Lancaster was going to have seizures when he began to sober up, and the jailers needed to keep a close watch on him. Nero also told her to call him if anything happened so he could take Lancaster to the doctor.

Next, Lancaster's father went to the jail. The father told Jailer Rankins that he wanted to see Lancaster, and he wanted to get him out of jail. Rankins refused to let Lancaster's father see his son. Lancaster's father then warned Rankins that Lancaster has seizures and would need to be watched.

Rankins told the father that the jailers were going to look after Lancaster, that somebody would be with Lancaster all night, and that he (Rankins) would check on Lancaster every twenty minutes. Rankins logged into the jail notebook information provided by Lancaster's father, including the fact that if Lancaster had a seizure, he could have three to four seizures within seven to ten minutes of each other.

Around 9:00 p.m., Lancaster asked Jailer Rankins for a soft drink, and Rankins brought him one. After that, Lancaster's cellmates never saw Rankins or any other jailer making rounds that night or the next morning. However, the cellmates slept off and on through the night, and Rankins and the other jailers testified that they made frequent rounds during the night.

When the cellmates were awake, they saw Lancaster visibly shaking. They also observed him climbing across the top bunk beds and trying to get out of his cell through the bars and the ceiling. Lancaster complained to them of headaches. When he used the toilet, he had trouble cleaning himself. Each time Lancaster got down from his bunk, his cellmates had to help him get back into bed.

Jailer Rankins' shift ended at midnight, and he was replaced by Defendant Eddie Wells. Rankins explained to Wells that Lancaster should be kept under a close watch, because Lancaster had experienced seizures from alcohol withdrawal in the past and might go into seizures that night.

Around 2:00 a.m., Lancaster asked Jailer Wells for a soft drink, telling Wells he was thirsty and felt "rough." Wells brought Lancaster a soft drink. Lancaster spent the duration of the night walking around the cell or lying on his top bunk. When Wells made rounds that night, he saw Lancaster on the top bunk. Around 5:30 a.m., Ms. Lancaster called the jail to find out if Lancaster had experienced a seizure yet; she spoke with Jailer Wells. She warned Wells that Lancaster was a chronic alcoholic and would go into DTs. She also told him that it was approaching time for Lancaster to have a seizure. Ms. Lancaster informed Wells that Lancaster had been in the hospital about a month before due to seizures, and that he had been drinking heavily. Ms. Lancaster warned him that Lancaster would need help immediately if he had a seizure. Wells logged Ms. Lancaster's call into the jail notebook.

At 7:00 a.m., breakfast was served by the jail trustees, but Lancaster refused to eat. Around 8:00 a.m., Defendant Ann Jackson replaced Wells. Wells passed along to her the information about Lancaster. In particular, Wells told Jackson that Ms. Lancaster had called and had said Lancaster would soon experience seizures from alcohol withdrawal. Jackson made her first round of the jail at 8:05, and she saw Lancaster lying on a top bunk. She continued to make rounds approximately every ten or twenty minutes thereafter.

Around 9:30 a.m., Lancaster's cellmates saw him sit up in his bunk, making a choking noise. He was visibly shaking. He fell backwards out of his bunk and landed on his back on the floor. Lancaster's head struck the floor, and he began bleeding from the mouth. He continued to shake; a cellmate believed he was having seizures. The cellmates yelled for help.

According to the cellmates, it took at least ten minutes for anyone to arrive at the cell. Kitty Pugh, a dispatcher, was the first person to hear the cellmates' commotion and approach the cell. The cellmates hollered to her to hurry up, because she was walking. When Pugh arrived, she observed that Lancaster was shaking, and she believed he was having a seizure. Pugh saw Lancaster on the floor bleeding from his mouth, and she heard him making a gurgling noise. She instructed the cellmates to turn Lancaster over on his side.

Pugh went to call an ambulance. Jailer Jackson, who had heard the commotion from upstairs, came to the cell. Because the jail has a policy that a jailer cannot enter a jail cell without a deputy present, no matter what the emergency may be, neither Jackson nor Pugh entered the cell until the ambulance and a deputy arrived approximately seven minutes later.

About fifteen to twenty minutes after the ambulance arrived, Lancaster was taken to the Monroe County Hospital. Because of the severity of his head injury, he was later transferred to a hospital in Mobile. He died on March 9, 1995 of an intracranial hemorrhage. The doctor who performed the autopsy on Lancaster testified that he found evidence that Lancaster was biting his tongue when he fell, which is consistent with someone having a seizure.

## B. PROCEDURAL HISTORY

As administratrix of Lancaster's estate, Ms. Lancaster filed this suit in the Southern District

of Alabama against Monroe County, the Monroe County Commission, and Sheriff Tate. She later amended her complaint to state claims against Jailers Rankins, Wells, and Jackson. All of the individual defendants were sued in both their official and individual capacities.

Ms. Lancaster asserted four claims in her complaint. First, she claimed all of the defendants were liable under 42 U.S.C. § 1983 for violating Lancaster's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. Second, she claimed all of the defendants were liable under Alabama tort law for causing Lancaster's wrongful death. Third, Ms. Lancaster asserted an Americans with Disabilities Act (ADA) claim against Tate, Monroe County, and the Monroe County Commission. Fourth, she asserted a state law claim for negligence against Tate, Monroe County, and the Monroe County Commission.

Upon the defendants' motion for summary judgment, the district court granted summary judgment to all of the defendants on the § 1983 claim. Insofar as the § 1983 claim was asserted against Tate, Rankins, Wells, and Jackson in their official capacities, the court held that those defendants were covered by Eleventh Amendment immunity. Insofar as the claim was asserted against those defendants in their individual capacities, the court held that the defendants were entitled to qualified immunity. The court also concluded that Monroe County and the Monroe County Commission were not liable under § 1983 because, the court held, Ms. Lancaster had failed to show that any county policy or procedure amounted to deliberate indifference to Lancaster and was causally linked to Lancaster's death.

The district court also held that the ADA does not apply to persons incarcerated in prisons and jails. Accordingly, the court granted summary judgment on the ADA claim. In addition, the court granted summary judgment on the state law claims against Monroe County, the Monroe County Commission, and the individual defendants in their official capacities. The court held that Monroe County and the Monroe County Commission could not be held liable under a theory of *respondeat superior* for the acts of the sheriff, who is a state employee, or his agents. The court determined that the individual defendants were entitled to Eleventh Amendment immunity on the state law claims. Finally, the court held that summary judgment should be granted on the state law

claims against the sheriff and the jailers in their individual capacities, because the defendants were entitled to discretionary function immunity under Alabama law.

Ms. Lancaster appeals the grant of summary judgment on all claims except: the ADA claim; the § 1983 claim insofar as it was asserted against Sheriff Tate in his official capacity; and the state law negligence and wrongful death claims insofar as they were asserted against Monroe County and the Monroe County Commission.

## II. DISCUSSION

Summary judgment may be granted only when there are no genuine issues of material fact and judgment is appropriate as a matter of law. Fed.R.Civ.P. 56(c). This Court must apply the same legal standards that the district court was required to apply in its summary judgment decision. Therefore, the district court's decision is subject to *de novo* review. *See, e.g., Tinney v. Shores,* 77 F.3d 378, 380 (11th Cir.1996).

### A. THE SECTION 1983 CLAIM AGAINST TATE, RANKINS, WELLS, AND JACKSON IN THEIR INDIVIDUAL CAPACITIES

We begin with Ms. Lancaster's challenge to the district court's grant of summary judgment on her § 1983 claim against Tate, Rankins, Wells, and Jackson in their individual capacities. Ms. Lancaster contends that the district court erred in concluding that the sheriff and the jailers were entitled to qualified immunity.

Government officials performing discretionary functions are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The parties do not dispute that the defendants were acting within their discretionary authority at all times relevant to this case. Therefore, the issue before us is whether the defendants' conduct violated clearly established statutory or constitutional rights of which a reasonable sheriff or a reasonable jailer would have known. In judging the reasonableness of the defendants' actions, we consider not only the law established at the time of the relevant incident, but also "the information possessed by the official at the time the conduct occurred." *Suissa v. Fulton County,* 74 F.3d 266, 269 (11th Cir.1996) (citation omitted).

## 1. *The Clearly Established Law*

At the time of Lancaster's arrest on March 6, 1995, it was clearly established that a jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee.[6] *See, e.g., Thomas v. Town of Davie,* 847 F.2d 771, 772 (11th Cir.1988) (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). More specifically, the case law had made it clear that an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate. *See Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186 (11th Cir.1994) ("[K]nowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference."); *Carswell v. Bay County,* 854 F.2d 454, 457 (11th Cir.1988) ("[W]ith evidence of knowledge [of the prisoner's need for medical care] the jury could have concluded that the failure to provide Carswell with medical care constituted deliberate indifference."); *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 704 (11th Cir.1985) ("[K]nowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").

The case law also had clearly established before this case arose that an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay. *See Hill,* 40 F.3d at 1187 ("Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even

---

[6]A government official's treatment of a pre-trial detainee is governed by the Due Process Clause of the Fourteenth Amendment, *see Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861 1872 n. 16, 60 L.Ed.2d 447 (1979), while the Cruel and Unusual Punishment Clause of the Eighth Amendment governs an official's treatment of a convicted prisoner. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). We have held that the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs. *See Hamm v. DeKalb County,* 774 F.2d 1567, 1573-74 (11th Cir.1985). Because both Eighth Amendment cases and Fourteenth Amendment cases establish what constitutes "deliberate indifference," we will rely upon decisions in both types of cases.

to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem."); *Harris v. Coweta County,* 21 F.3d 388, 394 (11th Cir.1994) (sheriff was not entitled to qualified immunity where he intentionally delayed treatment that sheriff knew had been prescribed for inmate's serious medical need); *Thomas,* 847 F.2d at 773 (failure to provide prompt attention to serious medical needs by delaying medical treatment for nonmedical reasons constitutes deliberate indifference).

Thus, if the individual defendants knew that Lancaster had a serious medical need, then they should have known from the clearly established law that a total failure to obtain medical treatment for him amounted to deliberate indifference. In addition, if the individual defendants knew that Lancaster's medical condition was either life-threatening or urgent and would be significantly exacerbated by delaying treatment until after the first seizure, then they should have known that their decision to withhold treatment until he experienced a seizure amounted to deliberate indifference.

The individual defendants take the position that no prior decision of this Court clearly established that alcohol withdrawal is a serious or urgent medical problem that requires immediate medical attention, and absent such a prior decision, they are entitled to qualified immunity. The legal premise of the defendants' argument is simply wrong. Twelve years before this case arose, we decided *Morrison v. Washington County,* 700 F.2d 678 (11th Cir.1983). We concluded in *Morrison* that a chronic alcoholic suffering from acute alcohol withdrawal syndrome was "seriously ill." *Id.* at 686. We also concluded that "the removal of [the] seriously ill patient from a hospital and his confinement in a jail with no medical facilities under the observations of untrained personnel" amounted to deliberate indifference. *Id. Morrison* clearly established that sheriffs and jailers cannot place or keep a chronic alcoholic in jail without any medical supervision, when the defendants are aware that the alcoholic is suffering from a severe form of alcohol withdrawal.

In addition, another binding precedent placed the defendants on notice of the seriousness of acute alcohol withdrawal syndrome and the need to obtain medical treatment for an inmate suffering from that condition. *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir.1979), held that a sheriff and his jail officials acted with deliberate indifference by refusing to obtain medical treatment for a chronic

alcoholic suffering from withdrawal. *See id.* at 107-08. *Fielder* provided the defendants with legal notice of the requirement to obtain medical care for chronic alcoholic inmates suffering from alcohol withdrawal. *Fielder,* like *Morrison,* established that a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights.[7]

We turn now to the question of whether the evidence, viewed in the light most favorable to Ms. Lancaster, establishes that the individual defendants were deliberately indifferent to the medical needs of Lancaster. As we have explained, that question turns on the defendants' knowledge of the seriousness of Lancaster's medical condition and their action, or inaction, in the face of such knowledge.

### 2. *The Defendants' Knowledge of the Seriousness of Lancaster's Medical Needs and Their Reactions*

Whether each of the defendants had the requisite knowledge of the seriousness of Lancaster's medical needs is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *See Farmer v. Brennan,* 511 U.S. 825, 840, 114 S.Ct. 1970, 1981, 128 L.Ed.2d 811 (1994) (holding that inmate could prove by circumstantial evidence that prison officials had knowledge of a substantial risk of harm to inmate). After reviewing the evidence in the light most favorable to Ms. Lancaster, we agree with her that a reasonable jury could find that each of the defendants knew that Lancaster had an urgent medical condition. Furthermore, we agree that a jury could find that each of the defendants planned to keep Lancaster in jail without medical supervision or treatment until he had a seizure, even though the defendants should have known from

---

[7]The second premise of the individual defendant's position is that if there is no prior decision establishing that alcohol withdrawal is a serious, urgent medical problem, they are entitled to qualified immunity, even if their conduct did constitute deliberate indifference. There is some indication, albeit in dicta, to the contrary. *See Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186 (11th Cir.1994) (stating in dicta that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity"). *But see Adams v. St. Lucie County Sheriff's Dept.,* 998 F.2d 923 (11th Cir.1993) (en banc) (adopting the dissenting opinion of Judge Edmondson in *Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d at 1563, 1573-1579 (11th Cir.1992)). However, we need not decide that issue here, because even if a prior decision finding deliberate indifference in factually similar circumstances is required to defeat qualified immunity, that requirement is met in this case.

the clearly established law that such conduct amounted to deliberate indifference.

We begin with the evidence of Jailer Rankins' knowledge. Ms. Lancaster personally warned Rankins that Lancaster was a chronic alcoholic, and that he had been in the hospital recently with seizures. She also told Rankins that Lancaster's last seizure had almost killed him. She made Rankins aware that if Lancaster went very long without alcohol, he would have another seizure, which would make him jerk, turn blue, and require oxygen. Rankins had seen other persons suffering seizures. From those experiences, he knew that seizures were indicated by sweating, jerking, choking on the tongue, and swollen eyes.

We conclude that, based on what Ms. Lancaster told Rankins and what he already knew, a jury could find that Rankins understood Lancaster's medical condition was urgent and would be exacerbated by delaying treatment until after his first seizure. Furthermore, a jury could find that Rankins did not intend for Lancaster to receive medical treatment until he had a seizure.[8] There is evidence that, in the meantime, Rankins knew Lancaster was on a top bunk. Because there is evidence Rankins knew Lancaster had an urgent medical need but intentionally delayed obtaining treatment for Lancaster while leaving him on the top bunk bed, a jury could find that Rankins was deliberately indifferent to Lancaster's serious medical needs. Rankins is not entitled to qualified immunity at this stage of the proceedings.

Likewise, a jury could find that Sheriff Tate was deliberately indifferent to Lancaster's medical needs. Lancaster's father told Tate that Lancaster was expected to have a seizure within eight to ten hours of his arrest if he did not get alcohol or medicine. Lancaster's father also testified in his deposition that he personally gave Sheriff Tate the same information that Ms. Lancaster had provided Jailer Rankins. If that is true, Tate knew Lancaster had almost died from his last seizure. Given that evidence, a jury reasonably could find that Tate believed Lancaster's medical condition was serious, and that he knew Lancaster's medical condition was urgent and would be significantly exacerbated by delaying treatment until a seizure occurred. The evidence strongly suggests that Tate

---

[8]The jailer defendants do not contend that they were not authorized to obtain medical supervision for inmates. Indeed, the Alabama Code requires jailers to obtain medical care for sick inmates. *See* Ala.Code § 14-6-19 (1975).

did not plan for Lancaster to obtain medical treatment until after he had a seizure. Based on that evidence, a jury could find that Tate acted with deliberate indifference to Lancaster's medical needs. Tate is not entitled to qualified immunity at this stage.

The evidence at this stage regarding Jailer Wells' knowledge also would support a finding of deliberate indifference. During the jailers' shift change, Wells was warned by Rankins that Lancaster had previously experienced seizures from alcohol withdrawal and might go into seizures that night. Later that night, Ms. Lancaster spoke with Wells on the telephone and told him that the time for a seizure was approaching. She explained to Wells that Lancaster was a chronic alcoholic who had experienced DTs. Ms. Lancaster told Wells that Lancaster had been hospitalized recently due to seizures, and she warned Wells that Lancaster would need help immediately if he had a seizure. A jury reasonably could infer Wells appreciated the urgency of Lancaster's condition and knew that delaying treatment until after a seizure would significantly exacerbate his condition. In addition, a jury reasonably could find that, instead of obtaining medical treatment or supervision for Lancaster, Wells allowed Lancaster to remain on the top bunk in his precarious state. In sum, the evidence is sufficient for a jury to find that Wells' failure to act amounted to deliberate indifference to Lancaster's serious medical needs. Wells is not entitled to qualified immunity at this stage.

Finally, we consider the evidence relevant to Jailer Jackson's knowledge. Jackson testified that she knew seizures were life-threatening, and she actually believed Lancaster would have a seizure. Yet, the evidence indicates Jackson did not attempt to obtain medical treatment for Lancaster until after he had a seizure, and she did not take action to have a deputy at the jail in case of an emergency so that she could enter Lancaster's cell. Moreover, Jackson was aware that Lancaster was resting on a top bunk at the time he was expected to have a seizure. Based on all of that evidence, a jury reasonably could find that Jackson's failure to act amounted to deliberate indifference to Lancaster's serious medical needs. Jackson is not entitled to qualified immunity at this stage.

To summarize, a jury reasonably could find that: (1) each of the individual defendants knew Lancaster had urgent medical needs that would be significantly exacerbated by delay, and (2) each

of the defendants delayed obtaining treatment for Lancaster until after he suffered a seizure. Because the law clearly established that such conduct violated a pre-trial detainee's Fourteenth Amendment right to due process, the defendants are not entitled to qualified immunity.

B. THE SECTION 1983 CLAIM AGAINST MONROE COUNTY AND THE MONROE COUNTY COMMISSION

Ms. Lancaster did not appeal the district court's grant of summary judgment on her state law claims against Monroe County and the Monroe County Commission, but she has appealed the grant of summary judgment against her on her § 1983 deliberate indifference claim against them. A local government may be held liable under § 1983 for injuries caused by an unconstitutional policy adopted by local lawmakers or by "those whose edicts or acts may fairly be said to represent official policy" for the local government. *Monell v. Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). Ms. Lancaster contends that Sheriff Tate has adopted or enforced several policies that demonstrated deliberate indifference to Lancaster's medical needs and resulted in his death. She further argues that Tate is the final policymaker for the county with respect to jail operations and inmate health and safety and, therefore, the county defendants may be held liable for constitutional violations caused by Tate's policies. The county defendants argue in response that: (1) Tate is not the final policymaker for the county in the relevant areas, and (2) Ms. Lancaster has failed to demonstrate that any county policy resulted in Lancaster's death.

Sheriff Tate testified in his deposition that he establishes the written policies and procedures for the Monroe County Jail, and he also controls the jail through verbal directives. There is no real dispute about whether Sheriff Tate acts as a final policymaker for some governmental entity. The parties do dispute, however, whether Tate acts as the final policymaking authority *for the county,* as opposed to the state.

Our precedents establish that, in running a jail and seeing to the welfare of jail inmates, an Alabama sheriff acts as the final policymaking authority for the county, not the state.[9] *See Hale v.*

---

[9] The rule is to the contrary in regard to actions an Alabama sheriff takes in his or her law enforcement capacity. *See McMillian v. Monroe County, --- U.S. ----, 117 S.Ct. 1734, --- L.Ed.2d ----* (1997).

*Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995); *Parker v. Williams,* 862 F.2d 1471, 1480 (11th Cir.1989). In *Parker,* an Alabama sheriff hired a jailer without conducting an adequate background check which would have disclosed the jailer's criminal history, mental problems, and history of drug use. *See id.* at 1477. The jailer raped a female arrestee. *See id.* at 1473. We held in *Parker* that Alabama sheriffs are the final repository of county authority with respect to the operations of jails and the hiring of jailers and, therefore, the county could be held liable for the sheriff's hiring policy, which resulted in the inmate's injuries.[10] *See id.* at 1480.

In *Hale,* another deliberate indifference case, we held that the county could be liable for the sheriff's policies, because the sheriff "was the County official responsible for making final policy for the jail." *See* 50 F.3d at 1582.

If the *Parker* and *Hale* precedents continue to be the law in this circuit, then it is clear that Sheriff Tate is a final policymaker for Monroe County, and we will be required to address the county and county commission's remaining arguments against § 1983 liability. However, we have recently granted hearing en banc in *Turquitt v. Jefferson County, see* 102 F.3d 465 (11th Cir.1996) (granting hearing en banc), to decide whether *Parker* and its progeny, such as *Hale,* should be overruled. Given the resulting uncertainty on this issue, we have decided to sever from this appeal and hold in abeyance the part of the case involving Ms. Lancaster's appeal from the judgment of the district court granting the county and county commission summary judgment on the § 1983 claims. After the en banc court issues its decision in *Turquitt,* we will issue a separate opinion in this case disposing of that remaining part of the district court's judgment.[11]

---

[10]In its recent decision in *Board of the County Comm'rs v. Brown,* --- U.S. ----, ----, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626, the Supreme Court held that a sheriff's failure to adequately screen a deputy's background did not amount to deliberate indifference to the risk that the deputy would use excessive force on an arrestee. *See id.* at ----, 117 S.Ct. at 1393. The facts of *Parker* are similar to those in *Brown* and, for that reason, *Parker's* holding on deliberate indifference may no longer be good law. However, *Brown* does not disturb *Parker's* holding that Alabama sheriffs are final county policymakers with respect to the operation of county jails. The *Parker* court based that conclusion on Alabama law, *see* 862 F.2d at 1478-80, and its holding continues to be the law of this Circuit.

[11]Our action in severing the § 1983 claim against the county and county commission (which is the only claim in this appeal involving those defendants) will not affect the running of the time for filing a petition for rehearing or suggestion of rehearing en banc, or issuance of the mandate,

C. THE SECTION 1983 AND STATE LAW CLAIMS AGAINST RANKINS, WELLS, AND JACKSON IN THEIR OFFICIAL CAPACITIES

A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida,* --- U.S. ----, ----, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence,* 916 F.2d 1521, 1525 (11th Cir.1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities.

The district court ruled that Sheriff Tate is a state official and, therefore, Tate was entitled to summary judgment on Ms. Lancaster's § 1983 official capacity claims. That ruling is a correct application of *Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989), and Ms. Lancaster does not challenge that determination on appeal. However, she does contend that the court erred in granting summary judgment to the jailers on Eleventh Amendment grounds. She argues that jailers are not state officials and, as a result, they are not entitled to immunity from suit in their official capacities.

"To determine whether a state official is covered by Eleventh Amendment immunity, we consider the laws of the state." *Carr,* 916 F.2d at 1525 (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)). In *Carr,* we held that under Alabama law deputy sheriffs are state officials entitled to Eleventh Amendment immunity when sued in their official capacities. 916 F.2d at 1526. We reached that conclusion after considering three factors: (1) the relationship between sheriffs and deputies under Alabama law; (2) the control that the county exercises over sheriffs and deputies; and (3) whether an award of damages against the deputies in their official capacities would be paid with state funds. *See id.* at 1525-26.

---

insofar as the part of the district court's judgment involving the other defendants is concerned. However, contemporaneously with the issuance of this opinion, we have entered an order sending this case in its entirety to mediation, and the parties remain free to move for a stay of the mandate relating to this opinion pending the results of that mediation.

Applying the same factors in this case, we agree with the district court that Alabama jailers are state officials entitled to Eleventh Amendment immunity when sued in their official capacities. As the district court noted, under Alabama law jailers carry out the sheriff's duty to maintain "legal custody and charge of the jail in his county and all prisoners committed thereto." *See* Ala.Code § 14-6-1 (1975). Although jailers may not function as an "extension" of the sheriff to the same degree that deputies do, because a jailer cannot undertake every act that the sheriff could perform, *cf. Carr,* 916 F.2d at 1526 (deputies are a legal extension of the sheriff because they act as sheriff's agent and can perform any act within sheriff's authority), nevertheless, jailers are responsible to the sheriff for their performance of state-mandated duties. Sheriffs and jailers have a close working relationship under Alabama law.

That working relationship is not sufficiently intruded upon by county control to deny jailers Eleventh Amendment immunity for official capacity claims. Ms. Lancaster argues that because Alabama counties pay jailers' salaries, we should presume that counties exercise significant control over jailers. But counties are required to pay the sheriff's expenses, including the salaries of his jailers. *See* Ala.Code § 11-12-15(a)(2) (1975). The counties have no control over that fact. Moreover, Alabama counties also pay the salaries of sheriffs and deputies, who are state officials. *See Carr,* 916 F.2d at 1524, 1526. Payment of salaries—especially when required by law—does not establish county control over the jailers for Eleventh Amendment purposes.

By contrast, the sheriff's power to pick his own employees demonstrates control over those employees. In *Carr,* we deemed it significant that the sheriff, and not the county, has the power to choose his own deputies. *See* 916 F.2d at 1526. We held that a county's limited control over the employment of deputies, shown by the county's requirement of "good cause" hearings for the termination of deputies, was outweighed by the sheriff's freedom to hand-pick deputies from among qualified applicants. *See id.* Here, there is no evidence that the county has any more control over jailers than it has over deputies. The counties are required to pay jailers' salaries after the sheriff hires them, and there is no evidence in the record of "good cause" termination requirements or any other exercise of county control. Meanwhile, the sheriff retains the authority to pick his own jailers.

*See* Ala.Code § 14-6-1 (1975). Thus, the "county control" factor weighs in favor of treating jailers as state officials entitled to Eleventh Amendment immunity.

The final factor relevant to determining whether jailers are entitled to Eleventh Amendment immunity is whether damages awarded against a jailer would come out of the state treasury, as opposed to county funds. Ms. Lancaster has not argued that a damage award against a jailer would be paid out of county funds, and the record contains no evidence suggesting that would be the case. "In the absence of clear evidence that the counties would pay a damages award against the [jailers], we cannot find that this policy consideration underlying Eleventh Amendment immunity defeats the [jailers'] claim to immunity." *Carr,* 916 F.2d at 1526-27. We hold that the jailers are state officials for the purpose of Eleventh Amendment immunity.

## D. THE STATE LAW CLAIMS AGAINST TATE, RANKINS, WELLS, AND JACKSON IN THEIR INDIVIDUAL CAPACITIES

The district court granted summary judgment in favor of Tate, Rankins, Wells, and Jackson on Ms. Lancaster's state law negligence and wrongful death claims after concluding that the defendants were entitled to immunity under Alabama law.[12] We affirm that grant of summary judgment.

"[U]nder Alabama law, a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity." *McMillian v. Johnson,* 101 F.3d 1363, 1365 (11th Cir.1996). The source of absolute sovereign immunity is Article I, § 14 of the Alabama Constitution of 1901, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." That provision bars any suit against the state of Alabama or its agencies. *See Phillips v. Thomas,* 555 So.2d 81, 83 (Ala.1989). That provision also grants immunity to state

---

[12]The district court did not distinguish between Ms. Lancaster's negligence claim and the wrongful death claim in deciding whether the individual defendants are entitled to immunity. The wrongful death claim alleges "neglect, carelessness, and/or unskillfulness, ... [and] knowing denial of adequate protection of Mr. Lancaster." Those allegations do not suggest a degree of fault greater than criminal recklessness or wantonness. For the purpose of deciding a state official's immunity from suit, Alabama law does not distinguish between claims of wanton mistreatment and claims of negligent mistreatment. *See Oliver v. Townsend,* 534 So.2d 1038, 1044 (Ala.1988). Accordingly, the district court's decision to treat the claims identically was proper, and we will use the same approach here.

officers and employees in their official and individual capacities, when the action is, in reality, a suit against the state. *See id.*

The Alabama Supreme Court has held that a suit brought against a sheriff or a deputy sheriff in his individual capacity alleging negligence in the performance of his statutory duties should be treated as a suit against the state.[13] *See Alexander v. Hatfield,* 652 So.2d 1142, 1144 (Ala.1994) (holding that deputy sheriff was immune from suit claiming negligence in the performance of his statutory duties); *Parker v. Amerson,* 519 So.2d 442, 442-43 (Ala.1987) ("A sheriff is ... immune from suit under Article I, § 14, Alabama Constitution of 1901, in the execution of the duties of his office...."). Obtaining medical attention for sick prisoners is a statutory duty of Alabama sheriffs. *See* Ala.Code § 14-6-19 (1975). Accordingly, Sheriff Tate may not be sued for the negligent performance of his duty to obtain medical attention for Lancaster. *Cf. Oliver v. Townsend,* 534 So.2d 1038, 1044 (Ala.1988) (holding that sheriff is entitled to absolute immunity from suit alleging negligence or wanton and wantonness in transferring sick prisoner to different jail, thereby causing his death).

Like sheriffs, jailers have a statutory duty to obtain medical care for sick prisoners. *See* Ala.Code § 14-6-19 (1975). The Alabama Supreme Court has never addressed whether a suit brought against a jailer in his individual capacity alleging negligent performance of his statutory duties should be treated as a suit against the state. Yet, given our holding that jailers are entitled to Eleventh Amendment immunity for official capacity claims, we find no reasonable basis for distinguishing claims against the jailers from claims against the sheriff. In deciding whether an action against a state officer is, in fact, an action against the state, Alabama law instructs us to consider the nature of the action and the relief sought. *See Phillips,* 555 So.2d at 83. According to *Parker v. Amerson,* if the "nature of the action" is a suit against a state official for the negligent performance of his statutory duties, that action is in reality a suit against the state. *See* 519 So.2d

---

[13]At the same time, the Alabama Supreme Court has stated that sheriffs do not have absolute immunity in all circumstances. *See Coleman v. City of Dothan,* 598 So.2d 873, 875 n. 2 (Ala.1992) ("We are careful to point out ... that a sheriff is not entitled to absolute immunity in all situations."); *White v. Birchfield,* 582 So.2d 1085, 1088 (Ala.1991) ("[B]y this opinion, we are not to be understood as granting absolute immunity to a sheriff in all situations.").

at 446. It does not matter, either, that Ms. Lancaster seeks only damages from the individual defendants. The same relief was sought from the deputy sheriff in *Alexander;* nevertheless, the Alabama Supreme Court treated the suit as one against the state. *See Alexander,* 652 So.2d at 1143-44.

We believe the Alabama Supreme Court would accord the same treatment to Ms. Lancaster's claims of negligence and wrongful death against the jailers that it has given claims against sheriffs and deputy sheriffs. Accordingly, we hold that those claims are barred by Alabama's absolute sovereign immunity.

### III. CONCLUSION

We AFFIRM the district court's grant of summary judgment on the negligence and wrongful death claims against Tate, Rankins, Wells, and Jackson and the § 1983 claim against those defendants in their official capacities. We REVERSE the district court's grant of summary judgment on the § 1983 claim against Tate, Rankins, Wells, and Jackson in their individual capacities. We REMAND for further proceedings consistent with this opinion those parts of this case that are addressed in this paragraph.

We SEVER that portion of this appeal that involves the summary judgment granted to Monroe County and the Monroe County Commission on the § 1983 claim. We will decide that portion of the appeal following release of the decision by the en banc court in *Turquitt v. Jefferson County,* 102 F.3d 465 (11th Cir.1996) (granting hearing en banc).