These consolidated medical malpractice suits (including the husband's derivative action for medical expenses and loss of services), claiming damages for negligence and lack of informed consent in the performance of a vaginal hysterectomy, present two dispositive issues:
1. Whether the trial Court erred in directing a verdict for the Defendant on the negligence claim where the urologist who performed the corrective surgery testified as follows:
 "Q In a vaginal hysterectomy would it be anticipated that the ureter would be sutured in an operation?
"A No, Sir.
". . .
 "Doctor, is it in keeping with the standard of care exercised by obstetricians in this community to suture both ureters during an operation?
"A Of course not."
2. Did the trial Court err to reversal in not putting the case to a jury on the lack of informed consent claim where the only proof relating to informing the patient of the risk attending the operation was the general consent form executed by the patient upon entering the hospital?
We hold that the trial Court erred in granting Defendant's motion for a directed verdict as to both claims. Thus, we reverse the judgments appealed from and remand the causes for further proceedings.
Appellee insists, and we agree, that professional malpractice cases, unlike negligence cases generally, require a unique quality of proof of the alleged wrongdoing. Only in the most extreme cases will the jury be permitted to find professional misconduct, resulting in injury within the doctor/patient relationship, absent expert testimony as to the standard of care which the doctor is alleged to have breached. The rule is summarized at 61 Am.Jur.2d, Physicians, Surgeons, etc., § 202 (1972), p. 337, that expert testimony is usually "an indispensable prerequisite to the establishment of liability in obstetrical malpractice cases." See, also, Thomas v. Berrios,348 So.2d 905 (Fla.App. 1977).
While we have no hesitancy in concluding, consistent with Appellee's contention, that this case does not fall within the exception that would allow a jury to exercise its fact-finding prerogative to adjudge liability absent expert testimony, this is not the issue before us. The issue here is whether the testimony of Dr. Hensleigh (the corrective urological surgeon) meets *Page 1122 
the expert testimony test to overcome the Defendant's motion for directed verdicts.
Appellee's brief, in support of affirmance, states:
 "Plaintiffs had no expert testimony on the issue of negligent treatment by the defendants. Plaintiffs contend that the alleged conflict in the testimony of Dr. John Hensleigh presented some scintilla on this issue. A clear reading of what plaintiffs contend is a contradiction in Dr. Hensleigh's testimony shows it was not a contradiction but rather an explanation due to the vague and ambiguous questions asked of the doctor by plaintiff's counsel. Those questions were as follows:
 "[Here appear the two questions and answers quoted above].
 "These questions were asked of Dr. Hensleigh during his deposition and later read into the record when plaintiffs introduced Dr. Hensleigh's deposition. Plaintiffs' counsel never attempted to ask Dr. Hensleigh any questions in order to clarify these answers and, more importantly, never made any effort to relate the answers . . . to the particular facts at hand.
 "In explaining the answers [when called as a witness for Defendant during trial,] Dr. Hensleigh testified that in a vaginal hysterectomy it is a recognized complication to suture nearby organs or parts of the anatomy. Dr. Hensleigh additionally related the standard of care to the instant case when he testified that he found no violation of the standard of care concerning a vaginal hysterectomy. Dr. Hensleigh was then allowed to explain his earlier answer and did so:
 "`That's all right. I meant that it is not part of the surgical procedure to tie off the ureters. So, that a surgeon is concerned about the ureters at all times. It is almost of more concern to them than the actual hysterectomy. They constantly perform due care to try not to do it.'"
 "A review of the full testimony of Dr. Hensleigh clearly indicates that it was his opinion that there has been no violation of the standard of care in the treatment of Mrs. Tant. Clearly there was no scintilla at the close of the evidence in Plaintiffs' behalf."
The weakness of this contention is that it reduces the validity of this evidence (i.e., its weight, credibility, and legal sufficiency) to a question of law. In essence, Appellee says that the trial Court was authorized to conclude, as a matter of law, in light of Dr. Hensleigh's subsequent "explanation," that his earlier deposition testimony was neutralized and rendered insufficient for submission to the jury in support of Plaintiffs' claims. Whether Dr. Hensleigh's "live" testimony on behalf of the Defendant is characterized as contradictory or as explanatory, with respect to his earlier testimony during deposition, is immaterial to our instant inquiry. In either event, it is solely within the province of the jury to evaluate its weight and its credibility.
Both questions set out above from Dr. Hensleigh's deposition and read into evidence at the trial are proper and clear; the Deponent's answers are definitive and unequivocal, without any indication that he was prevented from making whatever explanation he may have thought appropriate; and no explanation of his answers was elicited from Dr. Hensleigh by Appellee during the taking of his deposition.
The election of the Defendant to call Dr. Hensleigh as its witness and seek further explanation of his earlier answers to Plaintiffs' questions was entirely proper; but the trial Court invaded the province of the fact finder in ruling as a matter of law that his earlier testimony no longer met the minimum evidentiary efficacy for jury submission. Huff v. Vulcan Lifeand Accident Insurance Co., 281 Ala. 615, 206 So.2d 861 (1968);Parkinson v. Hudson, 265 Ala. 4, 88 So.2d 793 (1956).
To be sure, it is quite clear that Dr. Hensleigh's earlier testimony, in spite of the contradictory or explanatory nature of his subsequent testimony, not only furnishes a scintilla of evidence for submission of Plaintiffs' claims to the jury, but, if believed by *Page 1123 
the jury as to the appropriate standard of professional care, it is likewise legally adequate to support a jury verdict in their favor. By the same token, of course, the jury, upon consideration of all of the evidence, may exercise its fact-finding prerogative in favor of the Defendant.
Appellants also assert error in the trial Court's failure to submit to the jury their claims based upon lack of informed consent.[1] We agree. Appellee's brief summarizes its counter position as follows:
 "Plaintiffs further argue that there was a scintilla at the close of the evidence concerning the lack of informed consent. As a basis of this contention they cite to the testimony of Mrs. Tant. A full reading of Mrs. Tant's testimony in this area indicates that the only person she spoke with at the Women's Clinic was Dr. Alig. The Court did not allow the Plaintiffs to offer Mrs. Tant's testimony as to the transaction with Dr. Alig as it was improper evidence under the Dead Man's Statute. . . .
 "Plaintiffs contend that by striking the Estate of Dr. Alig as a party-defendant that they were then entitled to introduce the testimony by Mrs. Tant concerning conversations with Dr. Alig. However, Dr. Brockwell testified that Dr. Alig was a representative of the Women's Clinic when he treated Mrs. Tant. Because of Dr. Alig's relationship to the remaining defendant, Women's Clinic, the trial court properly excluded the offered testimony of Mrs. Tant as this type situation is one that is contemplated as being included within the bar of the [Dead Man's Statute, § 12-21-163], National Union Fire Insurance Company v. Weatherwax Gentry, 247 Ala. 143, 22 So.2d 733 (1945) and West Point Pepperell, Inc. v. Bradshaw, 377 F. Supp. 154 (Dist.Ct., Ala. 1974).
 "Thus a review of the actual testimony shows that there was no scintilla on behalf of the Plaintiffs in regard to this theory."
We agree with this proposition and the authorities cited in its support. This argument, however, overlooks the fact that Plaintiffs sought only to prove the absence of a transaction. It is a transaction with the deceased that is proscribed by the Dead Man's Statute; the denial of a transaction — i.e., a conversation between Dr. Alig and Mrs. Tant — is admissible.Wesson v. Taylor, 240 Ala. 284, 286, 198 So. 848, 850 (1940);Delony v. O'Reilly, 235 Ala. 386, 179 So. 207 (1938); Blount v.Blount, 158 Ala. 242, 48 So. 581 (1909).
The record is clear that the trial Court ruled adversely to Appellants on the lack of informed consent issue because it concluded that the Dead Man's Statute prohibited them from meeting their legal burden of proof, and not because the general consent form executed by Mrs. Tant constituted a legal defense to their claims. Consequently, we pretermit any discussion of the substantive law of informed consent. (We note that both Appellants and Appellee have indulged this presumption and neither has briefed the law in this area.)[2]
We have reviewed the remaining secondary issues raised by Appellants; and, apart from the primary issues discussed herein, we find no further error which would require reversal.
For the reasons set out in this opinion, the judgments below are due to be, and hereby are, reversed and these causes are remanded for a new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.
[1] The trial Court's grant of a directed verdict for the Defendant was based upon an evidentiary ruling under the Dead Man's Statute and not a ruling relative to the law's recognition vel non of a cause of action for lack of informed consent.
[2] For an excellent discussion of the law of informed consent (though not necessarily for its holding), see Canterbury v.Spence, 464 F.2d 772 (D.C. Cir. 1972). *Page 1124