KENNEDY, Justice.
The plaintiff, Richard Addison, as administrator of the estate of Annie Mae Addison, deceased, appeals a judgment based on a directed verdict in favor of the defendant, Orizaba Emfinger, M.D. We reverse and remand.
The issue is whether the plaintiff, in a medical malpractice action, presented a scintilla of evidence,[1] through expert testimony, that substandard care on the part of the defendant proximately caused the death of the decedent.
The decedent, Annie Mae Addison, was a regular patient of Dr. Orizaba Emfinger from 1978 until she died in 1985. Dr. Em-finger saw Ms. Addison numerous times from June 1980, until she was admitted for surgery in February 1985. At some point in 1978, Dr. Emfinger prescribed hydro-chlorothiazide, a blood pressure medicine, and treated the decedent for a kidney infection. Hydrochlorothiazide is known to cause pancreatitis in some patients. From 1980 to 1984 Ms. Addison complained on numerous occasions of intermittent abdominal pain and tenderness and she visited Dr. Emfinger several times for various treatments. In August 1983, Ms. Addison complained of abdominal tenderness, and Dr. Emfinger ordered a gallbladder X-ray, but he did not consider a potential problem with the pancreas. Dr. Emfinger advised Ms. Addison that she might require gallbladder surgery; however, she objected to the surgery at that time. In January 1985, she sought treatment at a hospital emergency room, complaining of severe abdominal pain. Dr. Emfinger treated her, but the medical records indicated that he did not consider potential pancreas problems. Three days later, Ms. .Addison was admitted to a hospital, complaining again of severe abdominal pain. On January 16, 1985, Dr. Charles Ingalls was called to assist in her treatment; he performed exploratory surgery, discovering acute necrotizing pan-creatitis, an infection of the pancreas. Ms. Addison’s pancreas was removed on January 30, 1985. She died from the infection on February 10, 1985.
In 1986, the plaintiff brought this medical malpractice action on two theories of liability: (1) that Dr. Emfinger failed to consider the possibility that the hydrochlo-rothiazide medication caused her to develop pancreatitis, which in turn proximately caused her death from acute necrotizing pancreatitis, or (2) that Dr. Emfinger was negligent in treating Ms. Addison’s gallbladder condition, and his negligence allowed the gallbladder condition to cause acute necrotizing pancreatitis, which in turn caused her death.
At trial, the plaintiff’s expert witness, Neil J. Farber, M. D., testified as to the plaintiff’s first theory of liability, as follows:
1. Concerning Ms. Addison’s June 17, 1980, visit:
“Q. Considering that she has taken blood pressure medicine, the hydro-chlorothiazide, the — the blood pressure pill back then, do you have an opinion
*377 as to whether or not the standard of care would have required Dr. Emfinger also to have considered pancreatitis?
“A. I do.
“Q. And what is that opinion?
“A. That he certainly should have considered it. The standard of care demanded that he consider pancreatitis as a possible etiology — the possible cause of this pain.
“Q. Would you say based on the abdominal complaint in June, ’80 — can you say which problems she was having, gallbladder or pancreas, just looking at the abdominal complaint?
“A. No, I can’t.
“Q. And the doctor should have considered both gallbladder problems and pancreatitis?
“A. Yes.
“Q. And there is no evidence that Dr. Emfinger considered pancreatitis on that visit?
“A. No. He ordered no tests.”
2.Concerning Ms. Addison’s May 10, 1983, visit:
“Q. Now May 10, 1983, look over at that note. Same answer or different answer?
“A. Well, there is a problem in that he — the patient has nausea, and has both abdomen and back pain, and he diagnoses right pyelitis, which is a kidney infection even though, and he says, in spite of only four to six white blood cells in the urine, which is the normal amount. So, there was no evidence, in looking at the urine, there was an infection in the kidney; but, he diagnosed it as due to the kidney infection anyway.
“Q. Okay. Well, should he have done gallbladder or pancreas tests on that occasion?
“A. Yes.
“Q. Does the standard of care require him to do it on that occasion?
“A. Yes. In fact, he specifically said no urinary symptoms at that time — urinary, meaning the bladder and kidney.
[[Image here]]
“Q. The standard of care required him to test for what?
“A. Well, to consider gallbladder disease at this point since it is in the right area for gallbladder disease; pancreat-itis could also be considered.
“Q. Considering she was taking blood pressure medicine did the standard require him to consider pancreatitis?
“A. Yeah.
“Q. Is there any evidence from his deposition or from those notes that he did consider pancreatitis?
“A. No.”
3. Concerning Ms. Addison’s April 23, 1984, visit:
“Q. Okay, now, mild abdomen pains. These signs are more consistent with— are they at all consistent with gallbladder disease, meaning somebody with gallbladder disease [sic] have an examination of their abdomen that turns out like this? Can that happen?
"A. Not usually. Not usually, no.
“Q. You say not usually, can it happen or not?
“A. I suppose rarely it could, yes.
“Q. What about pancreatitis?
“A. Yes, definitely.
“Q. Of the two, gallbladder disease or pancreatitis, based on the examination of the abdomen, which would be more likely?
“A. Pancreatitis.
“Q. Is there anything to indicate that Dr. Emfinger even considered the diagnosis of pancreatitis on the April 23, 1984, visit?
“A. No.
“Q. Did the standard of care require him to?
“A. Yes.
“Q. Were there any tests for pancreati-tis even at that time?'
“A. No.”
4. Concerning Ms. Addison’s May 30, 1984, visit:
“Q. Well now, on the May 30, 1984, visit, it is stated ‘sick and weak,’ and she had, according to the examination, *378 ‘mild generalized tenderness of her abdomen.’
[[Image here]]
“Q. Now, ought a physician consider gallbladder disease based on the findings of the May 30th visit?
“A. Yes, absolutely.
“Q. The same question about pancreati-tis.
“A. Absolutely.
“Q. Is there anything in the notes or in his deposition to indicate that he considered pancreatitis at that time?
“A. No, sir.”
5. Concerning Ms. Addison’s October 9, 1984, visit:
“Q. And then on the — two weeks back she is on blood pressure medicine— blood pressure medicine for two weeks. Is there any note of any abdominal problems?
“A. No, sir.
“Q. Okay. Then after she is on it about two months the next visit is October 19, 1984. She has been back on it for about two months. The abdominal examination indicated various vague mild tenderness — generalized tenderness.
“A. Yes, sir.
“Q. At that time, based on the notes of this examination, was the doctor taking care of this lady as required by the standard of care — to consider pancreat-itis?
“A. Yes, sir.
“Q. Is there any indication at all that Dr. Emfinger did?
“A. No.”
6. Concerning Ms. Addison’s January 11, 1985, visit to the hospital emergency room:
“Q. And at the time she was in the emergency room she was vomiting?
“A. That’s right.
“Q. And she was complaining, I believe, of severe abdominal pain, and when the doctor examined her he noted mild epigastric tenderness?
“A. That’s correct.
“Q. Is there any evidence that Dr. Em-finger even considered pancreatitis at that point?
“A. No, sir.
“Q. That is getting close to classic isn’t it?
“A. Yes, sir.
“Q. Does the standard of care require him to consider—
“A. (Interposing) Yes, sir.
“Q. —pancreatitis?
“A. Yes, sir.
“Q. Was any test given?
“A. No tests were given.
“Q. Any notes of any recommendation of any tests that she refused?
“A. No.”
7. Concerning Ms. Addison’s January 14, 1985, visit:
“Q. All right. Then we go here to the 14th. This is the office visit where the exam indicates mild generalized abdominal pain and tenderness maximum, and mild-epigastric, and light possible irritation. Is that what the exam revealed?
“A. Yes.
“Q. Should all of the physicians have considered pancreatitis?
“A. Yes.
“Q. Did he?
“A. No.
“Q. The legal question is did the standard require him to?
“A. Yes.”
8. Concerning the issue of proximate cause:
“Q. Dr. Farber, do you have an opinion as to whether or not Dr. Emfinger’s doing nothing with respect to considering or taking steps to diagnose pan-creatitis proximately caused the death of Mrs. Annie Mae Addison?
“A. Yes,
“Q. What is that opinion, please, sir?
“A. That it did basically, because he did not investigate the possibility of pan-creatitis: didn’t consider it, and didn’t do any tests; that she went on to develop acute pancreatitis, and then ne- *379 crotizing pancreatitis, and she died from that.”
Dr. Farber also testified, as to the plaintiffs second theory of liability, as follows:
1. Concerning decedent’s August 23, 1983, visit:
“Q. Okay. And the exam on August 23, 1983, revealed mild right subcostal and mild epigastric tenderness. Is that what the notes say?
“A. That’s right.”
[[Image here]]
“Q. Is there any indication that he considered gallbladder disease?
“A. Yes.
“Q. Okay. What did he — considering gallbladder disease what did he do?
“A. He ordered a gallbladder X-ray test. That’s where they take the tablets of dye and then get the X-rays the next day.
“Q. Okay. And was that done?
“A. That was done.
“Q. And that was done on the 24th, the next morning?
“A. That’s right.
“Q. And what did the X-ray show?
“A. It didn’t visualize, meaning that the gallbladder — the gallbladder didn’t take up the dye.
“Q. Okay. When the gallbladder doesn’t visualize, does that indicate you may have a problem in your gallbladder?
“A. Right.
“Q. He had one of them. Now, did he have her come back the next day?
“A. Yes.
“Q. Did he take another X-ray the next morning?
“A. Yes.
“Q. Okay. Before taking that other X-ray did he give her another dose of the dye?
“A. No.
“Q. Did it fail to show the gallbladder?
“A. Yes.
[[Image here]]
“Q. What did the standard of care require of Dr. Emfinger with respect to this episode in August of 1983, please, sir?
“A. Well, what he should have done is, first of all, repeat the gallbladder X-ray with extra tablets and Panopaque dye and do tests to rule out on X-ray.
“Q. Now, when she went to the emergency room the night before that, from those records did she have some pain?
“A. Yes.
“Q. How was that treated?
“A. I don’t remember specifically how she was treated that night. She was given the dye, he saw her on the 23rd, given Demerol, a powerful narcotic, a pain reliever.
“Q. Was that in keeping with the standard of care?
“A. No.
“Q. Why not?
“A. Anyone who has enough pain that they need one of the strongest pain killers we have should be admitted to the hospital.
“Q. Unless you know what it is?
“A. Unless you know what it is that is causing it, that’s right.
[[Image here]]
“Q. Is it possible that she had gallbladder problems?
“A. Yes, at some point in time.
“Q. Was Dr. Emfinger’s treatment of Mrs. Addison up to the standard required of him with gallbladder disease?
“A. No.”
Finally, Dr. Farber was asked his expert opinion on the issue of whether the decedent’s pancreatitis was aproximate result of her gallbladder condition:
“Q. Assuming, again, just for the purpose of the question that it wasn’t the blood pressure pill but it was gallbladder pancreatitis do you have an opinion that — as to whether or not Dr. Emfinger’s sub-standard care, with respect to the diagnosis and treatment of possible gallbladder disease, proximately caused her death?
“A. Yes.
“Q. And that opinion is what, please sir?
*380 “A. If it was due to the gallbladder disease early detection and surgery would have prevented her from, really, developing acute pancreatitis.”
The defendant’s expert witness, Charles Ingalls, M.D., the surgeon who operated on Ms. Addison, testified that she had gallbladder disease, which had caused her to develop acute necrotizing pancreatitis approximately a day before the surgery. Dr. Ingalls testified that the fact that Ms. Addison had been taking hydrochlorothiazide in minimal doses since 1978, prior to her developing acute necrotizing pancreatitis in mid-January 1985, played no role in her development of that condition, which led to her death. Dr. Ingall’s testimony allegedly refuted the factual basis for Dr. Farber’s opinion, which was that the hydrochloroth-iazide caused the development of acute ne-crotizing pancreatitis. Dr. Ingalls further testified that he would not have operated on Ms. Addison any earlier than he did for the acute necrotizing pancreatitis and that Dr. Emfinger had given her the proper treatment for pancreatitis before transferring her to his care. In addition, he concluded that Dr. Emfinger met the standard of care with regard to all of his treatment and recommendations for Ms. Addison’s condition.
At the close of the evidence, the court directed a verdict in favor of Dr. Emfinger. The plaintiff appealed from the resulting judgment.
The plaintiff argues that the testimony of his expert witness, Dr. Farber, as set forth herein, created a scintilla of evidence that would permit the trial court to submit the issue of liability to the jury. We agree.
As stated in Baker v. Chastain, 389 So.2d 932, 934 (Ala.1980):
“The rule in Alabama in medical malpractice cases is that to find liability, there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. There must be evidence that the negligence probably caused the injury.... However, in Alabama there need be only a scintilla of evidence to require submission to the jury. If the evidence presents a mere gleam, glimmer, spark, smallest trace or scintilla to support the theory or to sustain the issue, the trial court must submit the question to the jury_ When a directed verdict is requested, the entire evidence must be viewed in the light most favorable to the opposing party, ... and it should be refused where reasonable inferences may be drawn from the evidence unfavorable to the party requesting it or where there is a conflict in any material matter at issue_ We must allow such reasonable inferences as the jury was free to draw, not merely those inferences which we think more probable.” (Citations omitted.)
This Court, in Tant v. Women’s Clinic, 382 So.2d 1120 (Ala.1980), held that the following testimony, which was in contradiction to some later statements by the same doctor, was sufficient expert testimony to submit the issue of liability to the jury:
“Q. In a vaginal hysterectomy would it be anticipated that the ureter would be sutured in an operation?
“A. No, sir.
[[Image here]]
, “Q. Doctor, is it in keeping with the standard of care exercised by obstetricians in this community to suture both ureters during an operation?
“A. Of course not.”
We consider Dr. Farber’s statements to be sufficient expert testimony to submit the issue of liability to the jury. We hold that his testimony, and the inferences that a jury might reasonably draw from the entire evidence, present a scintilla of evidence for submission to the jury. “It is solely within the province of the jury to evaluate the weight and creditability of the evidence,” Baker, supra, at 935, and to determine whether Dr. Ingalls’s testimony totally outweighed that of Dr. Farber. Dr. Farber’s testimony “not only furnishes a scintilla of evidence for submission of [the plaintiff's] claims to the jury, but, if believed by the jury as to the appropriate standard of professional care, it is likewise legally adequate to support a jury verdict *381 in [the plaintiffs] favor. By the same token, of course, the jury, upon consideration of all the evidence, may exercise its fact-finding prerogative in favor of [Dr. Em-finger].'’ Tant, supra, at 1122-23.
Therefore, the judgment is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, ALMON and ADAMS, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.
HOUSTON, J., not sitting.

. The plaintiff brought this action on December 15, 1986; therefore, the Medical Liability Act of 1987, under Code 1975, § 6-5-540 et seq. (effective date June 11, 1987), and the “substantial evidence” rule, under Code 1975, § 12-21-12 (effective date June 11, 1987), do not apply.