880 So.2d 1101 (2003)
Sherrian Y. WILSON
v.
Rhoda MANNING.
1020432.
Supreme Court of Alabama.
October 24, 2003.
*1102 Bryan G. Duhé, Mobile, for appellant.
K. Paul Carbo, Jr., of Atchison, Crosby, Saad & Beebe, Mobile, for appellee.
HARWOOD, Justice.
Sherrian Y. Wilson sued Rhoda Manning, a registered nurse, asserting medical-malpractice claims, alleging that Manning's negligence resulted in further amputation of Wilson's leg.[1] Manning filed a motion for a summary judgment, with supporting evidentiary submissions, and Wilson filed a brief opposing the motion. The trial court granted the motion, and made the summary judgment final pursuant to Rule 54(b), Ala. R.Civ.P.[2]
Our review of a summary judgment is de novo.
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993)[overruled on other grounds, Bruce v. Cole, 854 So.2d 47 (Ala.2003) ]; *1103 Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
The record reveals that Wilson was arrested at her home on Wednesday, May 21, 1997, and was taken to the Mobile County Metro Jail for failing to appear at a hearing on a charge of negotiating a worthless instrument. Wilson was brought to the jail at 6:30 p.m., and a corrections officer noted on her "Jail Receiving Screening Form" that she had "bone cancer." At the time of her incarceration, Wilson was receiving intravenous antibiotic medication twice daily, through a Groshong shunt[3] in her chest, to treat what she termed a "bone disease" in her left leg, which had been amputated below the knee. When she was admitted to the jail, she had not had her second daily dosage of the antibiotic medication.
Manning, an employee of the Mobile County Sheriff's Department, was director of nursing at the jail and was responsible for supervising two medical secretaries, five registered nurses, and seven licensed practical nurses. She testified in her deposition, filed in support of her motion for a summary judgment, that the warden ran the jail and that his immediate supervisor was the chief, who answered to the chief deputy, who answered to the sheriff. On Thursday, May 22, Wilson signed a "consent for medical care"[4] form and filled out a "request for medical evaluation,"[5] on which she wrote "PAIN, leg stumpneed IV treatm[ent]. I have a shunt in my chest for bone disease."
That same day, in response to Wilson's request for a medical evaluation, Manning visited Wilson and filled out a "medical encounter record." Manning noted in the medical encounter record that Wilson informed her that she was a patient of Infirmary Home Health Agency, Inc., and she provided her doctor's name, Dr. Steven G. Alsip, and a telephone number for Infirmary Home Health. Manning telephoned Infirmary Home Health and spoke to Jackie Woolfolk, the nurse who administered Wilson's medications to her at Wilson's home. Manning recorded in the medical encounter record, and subsequently testified on deposition, that Woolfolk told her that Wilson was taking one gram of Cefotan, an antibiotic, intravenously twice daily, at 6:00 a.m. and 6:00 p.m., and was having the dressing changed on the Groshong shunt three times per week.[6] She also stated in her deposition: "The assessment from this lady, Jackie, was osteomyelitis,[[7]] amputee, *1104 car accident two years ago, long-standing, chronic." During her deposition, Manning further described her telephone conversation with Woolfolk:
"Q [Wilson's counsel]: 11:00 a.m. Did Jackie call or did you call Jackie or how did that conversation take place, as best as you can recall?
"A: I called.
"Q: Okay.
"A: Because I got the nurse's name.
"Q: All right. And did she indicate to you what the situation was with this lady's osteomyelitis and care and that sort of thing?
"A: Yes, the medication.
"Q: Okay.
"A: But it was not a doctor's order.
"Q: Okay. Didit was not a doctor's order? I'm sorry. Help me with that, now.
"A: She gave me a report
"Q: Right.
"A:an assessment, a history, butand told me what the patient had been on.
"Q: Right.
"A: But didn'tyou know, it was not a doctor's order. A nurse can't give another nurse or a
"Q: Sure.
"A: Office personnel can't give a doctor's order."
In regard to her conversation with Infirmary Home Health, Manning also stated that she telephoned them "to make them aware that [Wilson was] there so they [could] continue the treatment or whatever they do...." Woolfolk testified somewhat differently, by deposition, concerning the content of that telephone conversation. She stated that she telephoned the jail "and left a message for the head nurse to call me back." Woolfolk stated that when she talked to Manning, "I introduced myself, told her that I was the one who had been primarily seeing Sherrian. I told her what medication she was getting ... how often she was getting it, and who her doctor was, and I also gave her the doctor's phone number." Woolfolk testified that there was no discussion during that conversation about Infirmary Home Health's delivering Wilson's medication and she stated that Manning did not request that Infirmary Home Health send the medicine.
Manning noted in the May 22 medical encounter record that the medical "plan" for Wilson was for Lt. Smith, who she said in her deposition was "in charge of the jail's functions" at that time, to check on Wilson's being released because of the cost of her medications. On Friday, May 23, Manning added to the May 22 medical encounter record a notation that she had also notified Lt. York of Wilson's situation, and that he was going to telephone the judge to inquire about the possibility of Wilson's release. Manning acknowledged that this "plan" was adopted because the charge Wilson had been arrested for was a minor charge, but Wilson had not made bond and the estimated cost of her medicine, Cefotan, was "two hundred and fifty dollars a day."
Also on that Friday, Joann Peavy, a nurse working at the jail, completed a "physical examination" sheet, a "health history" sheet, a "mental status assessment sheet," and a "medical encounter record" in regard to Wilson. The health history sheet noted that Manning had cancer and that she wore a prosthesis below her left knee. The medical encounter record, which Manning signed, documented Wilson's medical condition, provided her doctor's name, and stated "no distress noted." That same day, Brenda Cain, a registered nurse working at the jail, filled out another medical encounter record concerning Wilson, which Manning also signed; that medical *1105 encounter record contained the following notation:
"5:00 p.[m.] Dr. Alsip's nurse Karen called. The family called to express concern that Ms. Wilson has not had her IV Therapy Cefotan in 3 days. Dr. Alsip was not aware she was incarcerated. He also wanted to know if her charges were drug related.
"5:00 p.[m.] 1. Placed call to Rhoda Manning to determine if arrangements had been made for [Infirmary Home Health] to come in and give her IV's daily and Groshong care 3 [times] weekly. 5:30 p.[m.] 2. Placed call to Warden Gaston to determine if a release had been arranged. 7:00 p.[m.] 3. Per R.M. [Rhoda Manning] contact [Infirmary Home Health] to set up visit in a.m. 10:30 p.[m.] 4. Emily (nurse on call) [Infirmary Home Health] returned call[Wilson] was discharged from their services due to noncompliance. .... She was never at home when nurse camenever got her medication and never got Groshong care. She would have to be a new admitreferral again from Dr. AlsipThey would then evaluate her referralundecided if they would take her on now again due to incarceration."
(Emphasis original.)
On Wednesday, May 28, Wilson, who was still incarcerated, filled out another request for medical evaluation form; that form stated, "I have an infection of the bone that is VERY active at present. I have a shunt in my chest and I need antibiotics I.V. and pain medication." (Capitalization in original.) At 9:10 a.m., on May 28, Manning completed another medical encounter record concerning Wilson, which stated:
"Called [and] spoke to Karen, Dr. Alsip's nurse. She states Infirmary Home Health cannot abandon this [patient]. She will call me back. 9:35 a.m. Nurse Karen called, she will call back to give [patient] her infusions [schedule]. She will talk [to] Mobile Infirmary Home Health. 11:30 a.m. Karen called back. [Infirmary Home Health] refuses to come in; they will provide the meds, but not the service. Ms. Wilson has an appointment [with] Dr. Alsip on Fri[day] 5/30/97 at 10:15 a.m. 11:35 a.m. [Paged] Dr. S. Eichold,[[8]] gave him report. He's going to call Karen. Will await one of their calls for instruction. 12:40 p.m. Dr. Eichold [called.] Infirmary Home Health will supply meds, we will give it."
In regard to her conversation with Dr. S. Eichold, Manning testified:
"A: And [Dr. Eichold] stated at that time that the Infirmarythat Infirmary Home Health will supply the meds and we will give it. That was the first time that we got any sort of treatment or medication orders.
"Q [Wilson's counsel]: Okay.
"A: They were bringing in the medication. I don't know what transpired during his conversation. We were in touch with Karen, Dr. Alsip's nurse
"Q: All right.
"A:and with Dr. Eichold.
"Q: All right. Now, where did the order come from to start her medication, is all I'm asking?
"A: [Infirmary Home Health] finally gave the order because they were supplying it. They had to have an order to supply the medicine."
Manning testified that Wilson was given a dose of antibiotics on May 28, at 6:00 p.m., and stated further:

*1106 "Q [Wilson's counsel]: Okay. And she got her medication on the 28th, did she not?
"A: Yes, because we received a doctor's order.
"Q: Why couldn't that have been done on the 22nd?
"A: I don't know. You need to ask [Infirmary] Home Health and Dr. Alsip.
"Q: Well, you are the person who actually got the ball rolling on the 28th to get her medication, aren't you?
"....
"Q: I mean, on the 28th, you are the one whoif I'm reading this, and you read it to me, you are the one who coordinated all of these activities to get her medication started? Am I wrong about that?
"A: You are right, but I also did that on the 23rd by way of Brenda Cain, the nurse, the RN.
"Q: Once you were unsuccessful on the 23rd, did you not feel incumbent to continue to try to get her medication for her no matter what the source was or to get her out of jail, I mean?
"A: That was obvious. We had tried all that. I cannot give especially a Groshong I.V. therapy without a doctor's orders. We had the doctor on the phone. He did not give us an order.
"Q: Well, couldn't you call him back and get an order? Is there something
"A: We had him on the phone. He didn't give an order."
Wilson's counsel questioned Manning concerning a possible breach of the standard of care, as follows:
"Q: I just have a couple just to follow up. In this case, this lady not having this type of medication for the condition for which she was suffering for a week, was there a standard of medical care breached in this case, in your opinion, by this lady not having her medication for a week?
"A: I'm not qualified to make that.
"Q: As an RNlet me just kind of backtrack a little bit. As an RN, do you think that a standard of care, your standard of care as an RN, was breached by not having this lady have her medication for seven days, just generically speaking?
"....
"A: Continuity of care is always important with delivering patient care.
"Q: Okay.
"A: But on the other hand, nurses can't just generate orders themselves.
"....
"Q: Assume there was an order here and that someone did not comply with that order after seven days. Would that be a breach of a standard of nursing care that you would expect to be delivered to Ms. Wilson? Do you want me to break it down for you?
"A: The integrity of delivering nursing care would have been breached, yes.
"....
"A: Okay. If there was a breach of care, my personal professional opinion is that it was with [Infirmary Home Health]. They could have either delivered the medication or they could have given us a written copy of the treatment order and the order. On the other hand, we had the doctor on the phone and he could have also have given us an order or faxed us an order.
"Q: Obviously there was a breach here?
"A: Yes."
Dr. Alsip sent Infirmary Home Health a letter, dated May 28, 1997, which stated, in relevant part:

*1107 "I was dismayed to hear about the gap in the treatment of our patient, Sherrian Wilson. To summarize the facts as I understand them, she was incarcerated at some point at the end of last week, perhaps May 22 or 23. We heard about the unfortunate turn of events with a call from the jail. We spoke with them, both my nurse and me, with the understanding that indeed there was a nurse available at the jail and that if Ms. Wilson did not leave jail, then her antibiotics could be delivered to the jail and infused by the nurse there. This has been done in the past when a patient on IV infusion therapy has been arrested. I personally spoke with the jail sometime after 5 o'clock the evening of May 23, and I know that they had your number and there was a clear understanding to continue her therapy if she were not to be released, which at that point seemed very unlikely. On call as I was all through the weekend, and then the office being open as usual on Monday, May 26, I expected I would have heard if there was a problem, either from you or from the jail. Unfortunately, I find that today, May 28, her antibiotic therapy was discontinued in spite of our efforts. I understand that it was unilateral on your part at least, in that you had no order from us to stop the therapy and the jail was more than happy to deliver the treatment, which I confirmed later in a phone call that I received from the medical director of the jail. After a series of phone calls today, the therapy was quickly reinstituted.
"How did such an occurrence take place? Even if your company felt that it was impossible for them to deliver[ ] therapy, shouldn't I have received some notification? I am afraid that this is the most recent dramatic example of problems that we have had with your company when we tried to deliver care to our patients. The questions that we receive from your representatives often portray an obviously poor knowledge base (such as being unfamiliar with common tests, drugs, and procedures), poor lines of communication within your company (multiple calls from different representatives of the Infirmary Home Health for the exact same orders), and unfortunately a lack of responsibility for the welfare of the patients. As we are often obligated to use your company through the contractual arrangements you have arranged, I hope that something can be done to improve the situation before anyone else gets hurt."
Wilson was released from the jail on May 29. According to Wilson's brief opposing Manning's summary-judgment motion and her brief to this Court, she was "taken immediately to Mobile Infirmary hospital where the remainder of her leg was amputated."

I. State-Agent Immunity
Wilson argues that the trial court "erroneously applied this Court's decision in Ex parte Alabama Department of Transportation, 764 So.2d 1263 (Ala.2000), and found that Rhoda Manning was entitled to discretionary[-function] immunity, and, therefore, granted the Defendant's motion for summary judgment." The trial court stated in its summary-judgment order, in relevant part:
"Rhoda Manning, as an employee of Sheriff [Jack] Tillman, is entitled to discretionary function immunity. [Wilson] has failed to present substantial evidence to raise a genuine issue of material fact as to whether Rhoda Manning acted fraudulently, willfully, maliciously or in bad faith. Ex parte Department of Transportation, 764 So.2d 1263 (Ala. 2000).

*1108 "Further, [Wilson] has failed to raise a genuine issue of material fact regarding whether Rhoda Manning breached the standard of care for treatment of [Wilson]. The evidence shows that Nurse Manning and/or nurses under her supervision contacted both the home health care agency and [Wilson's] personal physician in a timely manner. No orders were provided allowing the nursing staff to provide treatment to [Wilson] until May 28, 1997. Upon receipt of the doctor's orders the nursing staff administered the medication.
"Viewing all evidence in the light most favorable to [Wilson], the Court finds... Defendant Rhoda Manning is entitled to judgment based on discretionary function immunity and the failure of [Wilson] to present substantial evidence in which to raise a genuine issue of material fact regarding the breach of the standard of care."
Discretionary-function immunity is now referred to as State-agent immunity. Giambrone v. Douglas, 874 So.2d 1046, 1048 n. 1 (Ala.2003) ("The immunity available to individuals sued for actions taken on behalf of the State is now referred to as `State-agent immunity.'"). As Wilson notes in her brief to this Court, Manning's immunity claim should have been reviewed under the standard set forth in Ex parte Cranman, 792 So.2d 392 (Ala.2000).[9] Explaining the issue of State-agent immunity, this Court stated in Alabama Department of Corrections v. Thompson, 855 So.2d 1016, 1020 (Ala.2003):
"`Ex parte Cranman, 792 So.2d 392 (Ala.2000), recounts the evolution of State-agent immunity ...,' Ex parte Rizk, 791 So.2d [911] at 913 [(Ala.2000)], and restates the law on that topic:
"`We therefore restate the rule governing State-agent immunity:
"`A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
"`(1) formulating plans, policies, or designs; or
"`(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
"`(a) making administrative adjudications;
"`(b) allocating resources;
"`(c) negotiating contracts;
"`(d) hiring, firing, transferring, assigning, or supervising personnel; or
"`(3) discharging duties imposed on a department or agency by statute, rule, or regulation insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
"`(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
"`(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
"`Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be *1109 immune from civil liability in his or her personal capacity
"`(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
"`(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'
"Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000) (emphasis in original). `This restatement was adopted by our decisions in Ex parte Rizk, [supra,] and Ex parte Butts, 775 So.2d 173 (Ala.2000).' Ex parte Blankenship, 806 So.2d 1186, 1189 (Ala.2000)."
As noted, Manning, a registered nurse, worked for the Mobile County Sheriff's Department and, as director of nursing for the jail, supervised 14 employees. Wilson, in her brief, cites Ex parte Cranman, supra, for the proposition that "this Court found that in a medical malpractice setting state employees who deny proper care to patients entrusted to them fit within no category of conduct recognized by the restated rule ... as immune."
The only categories enumerated in Cranman that could possibly have any applicability to the facts of this case are (1), (2), or (3). Manning, in her brief to this Court, argues only the applicability of category (2). She states that "she was exercising her judgment in the administration of a department of the government."[10] Wilson argues that Manning, in her dealings with Wilson, was in violation of § 14-6-19, Ala.Code 1975, which provides:
"Necessary clothing and bedding must be furnished by the sheriff or jailer, at the expense of the county, to those prisoners who are unable to provide them for themselves, and also necessary medicines and medical attention to those who are sick or injured, when they are unable to provide them for themselves."
(Emphasis supplied.)
Although the statute states that "the sheriff or jailer" is responsible for providing "necessary medicines and medical attention," those duties were delegated to and assumed by Manning, as director of nursing for the jail, and she therefore also had the responsibility of conforming to the dictates of the statute. Compare Ex parte Progress Rail Servs. Corp., 869 So.2d 459, 469 (Ala.2003) ("Alabama ha[s] recognized the right of an employee to sue a co-employee for negligently failing to carry out his individually delegated or assumed duty to provide a safe workplace."). The facts of this case raise a genuine issue of material fact as to whether Manning provided Wilson the "necessary medicines and medical attention" required by § 14-6-19. Even if Manning was "exercising ... her judgment in the administration of a department or agency of government," Cranman, supra, she had no discretion to decline to provide necessary medicines and treatment in violation of that statute. Accordingly, the trial court erred in entering the summary judgment on the basis that *1110 Manning was entitled to State-agent immunity.

II. Breach of the Standard of Care
In its order, the trial court also stated that "Rhoda Manning is entitled to judgment based on ... the failure of [Wilson] to present substantial evidence [which raises] a genuine issue of material fact regarding the breach of the standard of care." This Court stated in Vaughan v. Oliver, 822 So.2d 1163, 1168 (Ala.2001):
"In medical-malpractice cases, `[t]he plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience.' McAfee v. Baptist Med. Ctr., 641 So.2d 265, 267 (Ala.1994)."
Wilson argues in her brief to this Court that Manning "admitted that she breached the standard of care" and that, even if she had not admitted that she breached the standard of care, Manning would still be held liable under Ex parte HealthSouth Corp., 851 So.2d 33, 42 (Ala.2002), which states:
"A plaintiff need not offer testimony of an expert witness in a medical-malpractice case (a) when the act or omission is in a class of cases `"where want of skill or lack of care is so apparent ... as to be understood by a layman, and requires only common knowledge and experience to understand it,"' [Tuscaloosa Orthopedic Appliance Co. v.] Wyatt, 460 So.2d [156] at 161 [(Ala. 1984)] (quoting Dimoff v. Maitre, 432 So.2d 1225, 1226-27 (Ala.1983)), such as when a foreign object is left in, the wrong body part is operated on, or a call for assistance is ignored for an unreasonable time; or (b) when a plaintiff either relies on `"`a recognized standard or authoritative medical text or treatise,'"' Anderson [v. Alabama Reference Labs.], 778 So.2d [806] at 811 [(Ala.2000)], or is himself a qualified medical expert."
(Emphasis supplied.)
Manning testified that Wilson "was my patient and I was trying to get medical orders. I was trying to get the medication. I was trying to get continuity." She explained that "continuity" means "to continue care in any setting" and acknowledged that "with antibiotics" continuity of care was important. Manning states in her brief to this Court that "[t]here is no testimony, expert or otherwise, which has been presented showing Nurse Manning or any of the nurses under her direction should have administered medication to Ms. Wilson without a doctor's order."[11] As noted, the record reveals that Manning testified that "the integrity of delivering nursing care would have been breached" if there had been a doctor's order that the nursing staff at the jail had not complied with for seven days. She admitted that "we had the doctor on the phone" and that an oral order from him would have been effective, but that no such order was requested from him; rather, her defense was simply, "he didn't give an order." Dr. Alsip stated in his letter to Infirmary Home Health, "I personally spoke with the jail sometime after 5 o'clock the evening of May 23, and I know that they had your number and there was a clear understanding to continue her therapy if she were not to be released, which at that point seemed very unlikely." Also, Manning replied "[y]es" when she was asked if "obviously" *1111 there had been a breach in the standard of care administered to Wilson.
"[T]his Court recognized [in Tant v. Women's Clinic, 382 So.2d 1120 (Ala. 1980),] that a plaintiff's burden of proving the standard of care in a medical-malpractice case can be met by expert testimony of the health-care provider or its employees." Tuck v. Health Care Auth. of Huntsville, 851 So.2d 498, 505 (Ala.2002). Drawing all reasonable inferences in favor of the nonmovant, Wilson, as we must, and taking into account Manning's testimony, we conclude that there was substantial evidence from which a reasonable juror could infer that Manning accepted Wilson as her patient with full knowledge of Wilson's "necessary medicines" and with full appreciation of the importance of continuity of care in antibiotic treatment, yet failed to provide that care beginning with the dosage due at 6:00 p.m. on May 21, 1997, through the 6:00 a.m. dosage due on May 28, resulting in a total of 14 missed doses.
For all that appears in the record before us, Manning did nothing to seek continuity of antibiotic treatment for Wilson from May 23 until May 28, when Wilson submitted another request for medical evaluation. Manning's only explanations for this prolonged interruption of continuity of care were that the "plan"devised May 22 and motivated by monetary considerations was to attempt to secure Wilson's release from jail and that Manning had no doctor's order to administer the drug. Manning elected to forgo asking Dr. Alsip or Dr. Eichold for such an order, passively relying on the fact that no such order was volunteered.
Dr. Alsip, in his May 28 letter to Infirmary Home Health, stated that it was his "clear understanding" on May 23, after he "personally spoke with the jail," that Wilson's therapy would be continued in the jail if she were not released. (Emphasis supplied.) He stated further that, "if there was a problem" in that regard, he would have expected to have heard from either Infirmary Home Health or "from the jail." Although he explains in that letter that he was continuously available for further contact after the conversation, he found out only on May 28 that Wilson's "antibiotic therapy was discontinued in spite of our efforts."
Collectively, all of this evidence provides the requisite "substantial evidence" sufficient to allow the fact-finder to infer from it that Manning breached the standard of care in her handling of Wilson's care by allowing her patient to be without 14 consecutive doses of "necessary medicines." We recognize that Manning produced countervailing evidence; our conclusion, however, is controlled by the proposition that all reasonable inferences must be drawn in favor of Wilson as the nonmovant. Quad Cities Nissan, Inc. v. Griffin, 638 So.2d 830, 831 (Ala.1994). Thus, the trial court erred in entering the summary judgment on the basis that there was not substantial evidence to prove a breach of the standard of care.
Accordingly, we reverse the summary judgment and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, SEE, LYONS, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., concurs specially.
JOHNSTONE, Justice (concurring specially).
I concur. I add that undertaking and then neglecting the medical treatment of a patient does not constitute "exercising ... judgment in the administration of a department or agency of government" and *1112 therefore does not constitute conduct immunized by paragraph (2) of the restatement in Ex parte Cranman, 792 So.2d 392, 405 (Ala.2000).
NOTES
[1] Wilson also named other individuals and entities as defendants in her amended complaint, but later voluntarily dismissed her claims against one entity and did not appeal the summary judgments for the other defendants.
[2] The summary-judgment motion was filed by, and summary judgment was entered for, three defendants; Wilson appeals only as to Manning.
[3] The record does not expressly describe the Groshong shunt; however, we infer that it is a type of surgically installed catheter used to administer intravenous medication.
[4] The consent stated, "I hereby authorize the Medical Staff at the Mobile County Sheriff's Department to treat and care for me while I am incarcerated at the Mobile County Jail."
[5] According to Manning, these forms are also called "sick call slips," and "[t]he inmates that are requesting medical care or to be seen on sick call make out the Request for Medical Evaluation." She stated in her deposition, "If I am in the office, I go ahead and go through the sick [call] slips. If I am not in the office, then the clinic director, Linda Singleton, sees the patient."
[6] The written order Dr. Alsip gave to Infirmary Home Health on May 12, 1997, called for that agency to administer the antibiotic in dosages of "1 gm in 50cc D5W q [every] 12 hours via Groshong," and "[c]hange dressing 3 × wk."
[7] Manning stated in her deposition that osteomyelitis is "a bacteria, a germ, that most often you see as the result of a gunshot wound or a dirty wound." Osteomyelitis is "an infectious usu. painful inflammatory disease of bone often of bacterial origin that may result in the death of bone tissue." Merriam-Webster's Collegiate Dictionary (11th ed.2003).
[8] Manning testified that "Dr. Eichold at that time was director of medicine [at the jail].... And he was basically responsible. So, I called him, gave him a report."
[9] Wilson stated in her brief, "The trial court was in error by failing to find that Ex parte Cranman ... controlled when, as in this case, [Manning], a state employee, is being sued in his or her individual capacity for medical malpractice."
[10] Manning also cites Ex parte Purvis, 689 So.2d 794 (Ala.1996), and Lancaster v. Monroe County, 116 F.3d 1419 (11th Cir.1997), in support of her immunity claim. However, those cases address sovereign immunity, not State-agent immunity. Manning never argued to the trial court, and therefore never gave Wilson an opportunity to respond to, the issue of sovereign immunity.
[11] Manning also argues that "[m]ore importantly, there is no evidence that any alleged breach of the standard of care by Ms. Manning proximately caused [Wilson's] injuries." Manning never raised the issue of lack of proximate cause in the trial court, giving Wilson no cause to present opposing argument or supplemental evidence; therefore, we will not consider the issue.